STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

17-978


MILO A. NICKEL, JR.

VERSUS

FORD MOTOR COMPANY, ET AL.


**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2013-625
HONORABLE RONALD F. WARE, DISTRICT JUDGE

**********

SHANNON J. GREMILLION
JUDGE

**********

Court composed of Shannon J. Gremillion, Phyllis M. Keaty, and D. Kent Savoie, Judges.


REVERSED.

**Kenneth Michael Wright**
**Attorney at Law**
**203 West Clarence Street**
**Lake Charles, LA 70601**
**(337) 439-6930**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
     **Milo A. Nickel, Jr.**

**Robert W. Maxwell**
**Bernard, Cassisa, Elliott & Davis**
**130 Terra Bella Boulevard**
**Covington, LA 70433**
**(985) 590-5019**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
     **Ford Motor Company**
     **Bolton Ford, LLC**

**Allen J. Mitchell, II**
**Mitchell & Blanco, LLC**
**One Lakeshore Drive, Suite 1495**
**Lake Charles, LA 70629**
**(337) 436-8686**
**COUNSEL FOR DEFENDANT/APPELLEE:**
     **State Farm Mutual Automobile Insurance Company**

**Jeffrey G. LaGarde**
**Bernard, Cassisa, Elliott & Davis**
**3838 N. Causeway Blvd, Suite 3050**
**Metairie, LA 70002**
**(504) 834-2612**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
     **Ford Motor Company**
     **Bolton Ford, LLC**

**GREMILLION, Judge.**

Ford Motor Company (Ford) and Bolton Ford, LLC (Bolton Ford) appeal the trial court's judgment in favor of Milo A. Nickel, Jr. (Nickel) awarding him $37,347.40 for rescission of the sale of a 2009 Ford Flex; $37,582.04 in rental charges minus a credit for use at $.20 per mile totaling $15,480.00; $15,000.00 for inconvenience and emotional distress; $379.91 for out-of-pocket expenses; $5,381.88 in costs; and $30,000.00 in attorney's fees. For the following reasons, we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

Nickel purchased a new 2009 Ford Flex on September 11, 2008 from Don Shetler Ford, Inc. (Shetler Ford) in Sulphur, Louisiana, for $37,347.10. The 2009 Ford Flex debuted the Ford SYNC system, an in-vehicle communications and entertainment system designed by Microsoft. Nickel experienced multiple problems with the system due to incompatibility issues between Microsoft and Apple, and Shetler Ford eventually replaced the radio navigation system.

Nickel was involved in an accident on October 21, 2008. His vehicle was repaired by Shetler Ford and a collision repair center. The repairs cost $9,057.61. Subsequent to the repair, Nickel stated in his petition that in addition to the other SYNC problems he was experiencing, "the gauges would sporadically stop working, all of the warning lights/and indicators would activate, the air conditioner would stop cooling and chimes would sound."

Nickel filed a petition against Ford, State Farm Automobile Insurance Company (State Farm), and Bolton Ford in February 2013 for rescission of the sale due to vice or defect.

Bolton Ford filed a peremptory exception of no cause of action on April 3, 2013, arguing that, since it had not sold the vehicle to Nickel, it should be dismissed

as no cause of action could lie in redhibition. Nickel filed an amending petition for damages in June 2013, urging rescission of the sale against Ford and for damages against Bolton Ford for negligent repairs, stating that Bolton Ford was liable to him for, "failure to diagnose and repair the vehicle for extended periods of time, and all damages suffered as a result thereof, including, but not limited to loss of use, reimbursement for rental charges, inconvenience and aggravation, mental anguish, or any other damages which the facts support . . . ."

Following a two-day trial in November 2016, the trial court rendered a judgment as follows: Ford and Bolton Ford's peremptory exception of prescription was denied; State Farm's motion for involuntary dismissal was granted; discovery sanctions in favor of Nickel's counsel in the amount of $3,000.00 was made final; and the trial court further rendered judgment in favor of Nickel as follows:

> 1. Re[s]cission of the sale and return to Plaintiff, MILO A. NICKEL, JR., of the sale price of the 2009 Ford Flex vehicle in the sum of $37,347.40;
>
> 2. Reimbursement to Plaintiff, MILO A. NICKEL, JR., of plaintiff's vehicle rental charges in the amount of $37,582.04, minus a credit of 20 [cents] per mile in the amount of $15,480.00, resulting in a reimbursement in the total amount of $22,102.04;
>
> 3. General damages for inconvenience and emotional distress payable to Plaintiff, MILO A. NICKEL, JR., in the total amount of $15,000.00;
>
> 4. Reimbursement to Plaintiff, MILO A NICKEL, JR., for out-of-pocket expenses in the amount of $379.91; and
>
> 5. Payment of attorney's fees to Kenneth Michael Wright as counsel for Plaintiff, MILO A. NICKEL, JR., are to be determined at a subsequent hearing on attorney's fees and costs.

Ford filed a motion for new trial in May 2017, which was denied in June 2017. The trial court rendered a judgment in June 2017 casting Ford and Bolton Ford with all court costs and awarding Nickel's counsel $30,000.00 in attorney's fees and $1,000.00 in paralegal fees. Ford and Bolton Ford now appeal.

2

# ASSIGNMENTS OF ERROR

Ford assigns as error:

1. The trial court erred in denying Ford's Peremptory Exception of Prescription despite undisputed evidence that the prescriptive period expired on Nickel's redhibition claims during the 28-month period that Nickel drove the vehicle 69,000 miles without once tendering the vehicle for repairs.

2. The evidence is insufficient to support the trial court's finding that a redhibitory defect existed in Nickel's vehicle and that the problems he experienced were unrelated to software incompatibility issues between the "SYNC" system and Nickel's mobile device and not caused by an accident involving the vehicle that occurred six weeks after Nickel purchased it.

3. The trial court erred in permitting Nickel to recover from Bolton Ford under a redhibition or negligent repair theory even though Bolton Ford was not the seller off Nickel's vehicle, Nickel did not give Bolton Ford essential information concerning the vehicle's collision history when he tendered his vehicle for repairs, and Nickel denied Bolton Ford authorization to perform repairs to Nickel's vehicle once the problem was diagnosed.

4. The trial court erred in awarding $15,000 in non-pecuniary damages to Nickel for his inconvenience and emotional distress related to his redhibition claims in the absence of any argument or finding that Nickel purchased the vehicle for any non-pecuniary purposes.

5. The trial court erred in awarding Nickel excessive damages for his rental care fees, most of which directly resulted from Nickel's failure to mitigate his damages and which he failed to prove with any documentation. Ford should not be charged for a year's worth of rental fees that Nickel incurred after refusing repairs and then abandoning his vehicle at a dealership for over a year.

6. The trial court erred in awarding Nickel the full purchase price of his vehicle because he failed to maintain the vehicle as a prudent administrator when he abandoned the vehicle to the elements, allowing its condition to deteriorate.

7. The trial court erred in awarding Nickel $30,000 in attorney's fees for a straightforward redhibition action and for awarding him costs for which he provided no evidence. Moreover, the trial court erred in awarding Ford credit for use in the amount of $.20 per-mile, when the current government rate is $.54.

## DISCUSSION

*Prescription*

Louisiana Civil Code Article 2534 provides (emphasis added):

A. (1) The action for redhibition against a seller who did not know of the existence of a defect in the thing sold prescribes in four years from the day delivery of such thing was made to the buyer *or one year from the day the defect was discovered by the buyer*, whichever occurs first.

(2) However, when the defect is of residential or commercial immovable property, an action for redhibition against a seller who did not know of the existence of the defect prescribes in one year from the day delivery of the property was made to the buyer.

B. The action for redhibition against a seller who knew, or is presumed to have known, of the existence of a defect in the thing sold prescribes in one year from the day the defect was discovered by the buyer.

C. In any case *prescription is interrupted when the seller accepts the thing for repairs and commences anew from the day he tenders it back to the buyer* or notifies the buyer of his refusal or inability to make the required repairs.

A party asserting a claim in redhibition must tender the vehicle for repair in order to interrupt prescription and maintain the action. *Granger v. Deville*, 583 So.2d 583 (La.App. 3 Cir. 1991). We review the trial court's finding that Nickel's claim was not prescribed using the manifest error standard of review because evidence was adduced at hearing on the exception. *Leija v. Ford Motor Co.*, 49,574 (La.App. 2 Cir. 1/14/15), 161 So.3d 1020. Accordingly, if the trial court's finding is reasonable after thoroughly reviewing the record, we cannot reverse it even if we may have held differently. *Stobart v. State, Through Dep't of Transp. & Dev.*, 617 So.2d 880 (La.1993).

[W]here documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination.

4

*Id.* at 882.

The trial court found that there was no paper trail because Nickel was personal friends with the owner of the Shetler Ford dealership. The trial court denied the exception based on its finding that there was an ongoing pattern of the vehicle being brought in for inspection and that prescription was interrupted until Bolton Ford sent notice to Nickel on January 18, 2013 that its repair efforts had ceased. The trial court stated at the conclusion of the trial:

> Due to the personal relationship Mr. Nickel had with Mr. Don Shetler, who owned the dealership at the time, and the fact that the vehicle never malfunctioned at the shop, formal work orders or repair orders were not executed or generated on every occasion Mr. Nickel brought the truck in because of these continuous, constant, reoccurring problems.
>
> The Court is satisfied with the explanations and reasons offered for the lack of a so-called paper trail detailing the dates and number of times the truck was brought in for inspection and repair.
>
> The defendant's peremptory exception of prescription is denied. Evidence of this ongoing pattern of the truck being brought in for inspection when it was having problems and the problems being undetectable once at the shop is found throughout the record. Again, therefore, prescription has not been proven. It was interrupted until Ford Motor Company sent notice to Mr. Nickel on January 18, 2013 that its repair efforts had ceased.

We find the trial court manifestly erred in its finding. There was no reasonable basis upon which the trial court could have found that Nickel brought the vehicle in for repair subsequent to May 29, 2009, but before the next records were generated by Bolton Ford on September 6, 2011.

The evidence relating to this issue was as follows. Mike Shetler, the owner of Shetler Ford when Nickel purchased the vehicle, testified that he has known Nickel for a number of years as they grew up together. Shetler testified that Nickel, an attorney, had also represented the dealership and him personally in legal matters, which included a redhibition claim. Shetler said that Nickel had purchased vehicles

5

from him in the past. The Ford Flex that Nickel purchased was the first year that it was released. Shetler stated that the Ford Flex was much different than any vehicle that had come before it because it had a different electronics system meant to be a more comprehensive computerized electronic component. Shetler ordered the car for Nickel, and it took approximately six months to arrive. As Nickel was a family friend, Shetler sold the car to him at "cost." Nickel picked up the 2009 model vehicle on September 11, 2008. According to Shetler's testimony, this Ford Flex was the first one sold by Shetler's dealership.

Shetler stated that Nickel would call him directly if he needed to address a problem. After about a week of owning the vehicle, Nickel called Shetler and said that the computer navigation system screen would turn off and lose the memory of information Nickel had input into the system. Shetler said that Nickel also reported that the blinkers would turn on and off and the dash lights "would do goofy things" but that the problems could not be duplicated at the dealership. Shetler testified that Nickel brought the vehicle in for repairs but the dealership was never able to determine what was causing the problems with the vehicle.

Shetler testified that Nickel called him from the scene of the October 21, 2008 accident and reported that he rear-ended someone. The vehicle was sent out for body work by Lloyd Lauw Repair Shop. During that time, Shetler Ford ordered a part from Ford and awaited the return of the vehicle. Shetler noted the part was installed in January 2009, after the vehicle came back from the body shop.[1] Shetler testified that in the spring following the purchase of the vehicle, Nickel reported that the vehicle died going down the road, but the dealership could not duplicate the concern.

---

[1] Shetler explained that the way that Ford rates dealerships relates to the timing between the ordering of a part and the closing of the ticket. Therefore, in order to maintain a good rating, even though the part had been ordered in the fall of 2008, the official Ford "ticket" was not dated until January 2009.

Shetler then reviewed repair orders issued by his dealership dated January 9, 2009, January 15, 2009, and May 27, 2009. In January 2009, the radio/navigation assembly was replaced; in March 2009, the radio navigation was replaced again; and in May 2009, Nickel's steering wheel sensor was replaced. In August 2009, Shetler sold the dealership to Tarver Ford.

Brian Bates, a service manager at Bolton Ford started working there in 2009 and was promoted to service manager in July 2012. Bates testified as to the procedure when someone brings in a car for repair. He said a technician writes down the complaints or problems the customer is having with the vehicle and then has the customer sign the paper, which authorizes the dealership to work on the car. A repair order is then generated and given to a dispatching agent, who assigns a technician to work on the car. Bates said this procedure is followed in every case for insurance reasons and so that they can be paid by Ford. Even if no problems are found or can be identified, a repair order is always generated because the dealership is still paid for diagnostic tests and time.

Christopher Furnas, an expert in automotive technology, had worked for Ford for over twenty-four years. Furnas explained that Ford's policy is that a vehicle does not come into a service bay without having a ticket written up. He said he has worked in every Lake Charles service department and all follow this procedure.

Ford generated no records whatsoever of Nickel bringing his vehicle in for repair for nearly two years and four months. Shetler Ford's last-generated repair order was May 27, 2009. Shetler sold the dealership three months later in August. The subsequent owner of the dealership was not a witness at trial.

Nickel was very vague in his allegations that he brought his vehicle in for repair but no repair orders were generated. His testimony relating to the two plus years of no records was as follows:

7

Q. Okay. Then from the – from the spring of '09, Mr. Shetler sold the dealership, until September 6th of 2011, there were no repair records, no service, nothing done at Shetler Ford or Tarver or anyone. We have a complete lack from 2009 to 2011. If my math is correct it's two years and four months; and when the vehicle came in, it had 69,357 more miles than you did, you know, at the time when you were having the – after it got back from the repair shop. So, does that sound about correct?

A. Some of that sounds correct. I disagree with the statement that I didn't take it anywhere from 5/09 to whatever, two years. I disagree with that.

Q. Well, if you did – you – you told us, I believe – is it correct, sir – that you didn't have this vehicle at any non-Ford dealership. You just took it to Ford dealerships.

A. That's correct.

Q. Okay. And if I ask you to assume that there's no repair records of any sort during this two-year-and-four-month period during which you drove 69,000 miles, if I'm incorrect, could tell me where you went and –

A. I –

Q. – where the repair record is?

A. I don't know about the repair record, but I know that I stopped at – the Ford dealership – Shetler Ford dealership in Crowley between 2009 and 2011.

Q. And that was one day you had called them and they couldn't look at your vehicle; am I correct?

A. That's right.

Q. Okay. I didn't mean – let me limit the question a little bit better, Mr. Nickel. I'm not talking about maybe you stopped in or you called somebody on the telephone. I'm talking about you bringing the vehicle in, saying, please service this vehicle and them doing some sort of work on it and giving you the vehicle back and giving you the repair order because the records indicate that there was a two-year-and-four-month gap; and when we next see the vehicle being serviced, it had an additional 69,357 miles on the odometer.

A. Sure. It's an objectively true statement.

Q. Okay.

A. But it's not accurate to say that there were no complaints during that period because –

Nickel generally claimed to have no control over what paperwork Ford generated. He produced no records or proof of any kind that he brought the car into Tarver Ford or any other Ford dealership for repair. As an attorney with experience in redhibition claims, Nickel would have had more awareness than a regular customer that a paper-trail of attempted repairs, even one he created for himself, should have been generated. Furthermore, because there was no special relationship with the owner of Tarver Ford, there is no reason that Tarver Ford would not generate the same records that every other Ford dealership generates when a customer brings a vehicle in for repair. Moreover, the records generated by Shetler Ford generally disprove Nickel's claim that he would bring it in but no records would be generated. Further, the start of the Shetler Ford service records is January 2009, some three months following the accident which required over $9,000.00 in repairs. In the meantime, over the two-year period, Nickel accumulated 77,000 miles on the car that allegedly constantly caused him problems.

We find that it was unreasonable for the trial court to conclude that Nickel continued to bring the car in for repairs but that no orders were generated. Accordingly, Nickel's redhibition claim against Ford prescribed on May 27, 2010, one year after his last attempt at service at Shetler Ford. Even if we gave Nickel the benefit of the doubt and concluded that he did bring it in to Shetler for repairs or to be looked at, Shetler sold the dealership in August 2009. Nickel established no special relationship with the subsequent owner whereby he would just bring it in with no formal paperwork generated in the routine and ordinary course of business. The subsequent owner did not testify at trial. Therefore, even if we assume that Nickel brought in the vehicle through August 2009 while Shetler was still the owner,

9

we find reasonable people could only conclude that Nickel may have brought it in without any records being generated by Shetler Ford before Shetler sold the dealership in 2009. Thus, even under this strained scenario, Nickel's claim is prescribed.

Because we find that Nickel's claim is prescribed, all of the remaining assignments of error pertaining to redhibition are rendered moot, and the judgment of the trial court in favor of Nickel is reversed.

*Bolton Ford/Negligent Repair*

Forgetting the fact that it is legally impossible for Bolton Ford to be liable to Nickel for a redhibitory defect in a car he purchased from another dealership, Nickel's claim in redhibition was prescribed as discussed above. *See* La.Civ.Code art. 2520. Therefore, the only remaining claim against Bolton Ford to be reviewed for manifest error is whether the trial court reasonably found that Bolton is liable to Nickel for negligent repair, a cause of action lying in tort rather than redhibition. *See* La.Civ.Code art. 2316; *Landry v. Int'l Harvester Co.*, 452 So.2d 806 (La.App. 3 Cir. 1984). The trial court found that Nickel did not abandon his vehicle at the dealership:

> I don't think he just abandoned the vehicle. They were in possession of the vehicle for quite some time. As I said earlier, they didn't expect it and they didn't – for a while. And Mr. Nickel, I think, was that, we're not going to do anything more. That should have been made clear to him sooner than it was. And I, you know, I don't think he necessarily abandoned the vehicle. He was waiting to hear from Ford Motor Company and Ford Motor Company was – it took them a while to get to that point, which I thought – when listening at the trial, I thought they should have gotten there much sooner and I thought they – it would be in their interest if they had, but they didn't. They were a little delinquent in getting that – making that known to Mr. Nickel while everything is just – you know, nothing is happening for a number of months.
>
> So I don't think he necessarily abandoned the vehicle.

The evidence at trial indicated that a repair order was generated by Bolton Ford on September 6, 2011. The repair order indicates that Nickel stated that the car would not start, but when the technician started the car the following morning it started every time, and no repairs were made. Subsequent repair orders generated by Bolton Ford show multiple attempts to diagnose and fix the problems Nickel claimed to be having with the vehicle. The vehicle remained at Bolton Ford until Furnas was able to assess the vehicle in April 2012. After getting a rundown of the car's history from the technicians, Furnas immediately had the car "racked" and determined it had been wrecked, a fact which had not been reported by Nickel. Furnas said that he could see evidence of body work and damage to the electrical area. He determined that the problems were electrical and most likely caused by the October 2008 accident. Furnas recommended that the power distribution box and electrical wiring harness be replaced. The cost of the repair was $2,500.00. Nickel subsequently contacted his insurer, State Farm, who refused to pay for the repair. Nickel testified that he refused to pay for the repair unless the dealership could guarantee 100% that the car would be fixed. Nickel was questioned:

Q. And after that time, since you declined to pay and State Farm declined to pay, there was nothing else done on the vehicle, correct?

A. Correct.

Q. And it sat there on the dealer lot for almost 18 months with nothing being done, correct? You left it there?

A. Eighteen months?

Q. Yes, sir.

A. From when? You're saying –

Q. Well, from the spring of 2012 through the middle of 2013, so maybe 18 months – it was, say, 12 months, 12 or 13 months.

11

A. Whatever that period of time was. I don't know the number of months, but it was there until we took it back.

Q. And during that time period, no one from Bolton Ford told you to please leave the car here for this year, right?

A. That's correct.

Q. No one said we're repairing your car during this year from 2012 to 2013, did they sir?

A. No.

Q. And, in fact, you finally got a certified letter from Bolton Ford from the service manager saying, please come get [y]our vehicle off of our lot?

A. That's true.

Bolton Ford sent a letter to Nickel in January 2013 requesting that he retrieve his vehicle from the Bolton Ford lot. The facts and testimony are clear that Nickel refused to pay for the repair and, effectively, abandoned his vehicle at the dealership. Considering that Bolton never actually repaired anything because Nickel refused to pay for the repair, it is hard to fathom how it could be found to have negligently repaired Nickel's Ford Flex or was otherwise negligent for allowing Nickel's vehicle to remain in storage on its lot. Accordingly, we reverse any finding by the trial court that Bolton Ford was negligent in any way pertaining to this vehicle.

## CONCLUSION

The judgment of the trial court finding Ford Motor Company and/or Bolton Ford, LLC liable in redhibition is reversed, as Nickel's redhibition claim is prescribed. Accordingly, all money judgments in his favor are reversed. The trial court's judgment casting Bolton Ford, LLC in judgment is reversed. All costs of this appeal are assessed to the Plaintiff-Appellee, Milo A. Nickel, Jr.

**REVERSED**.

12